# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

YVETTE YOUNG,                          :

     Plaintiff,                     :

                               Case No. 3:12cv00029

 vs.                                   :

                               District Judge Thomas M. Rose

CAROLYN COLVIN,                        :       Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,               :

     Defendant.                     :

## REPORT AND RECOMMENDATIONS[1]

## I.    <u>Introduction</u>

Plaintiff Yvette Young, a former factory worker, asks this Court to reverse the Social
Security Administration's denial of her application for Supplemental Security Income (SSI).
Young maintained during her administrative proceedings, and presently, that she was
eligible for SSI because she was under a disability. She relied, in part, on the opinions of her
treating physician, Dr. Miller, who concluded that she was unable to perform a full-time job.

Administrative Law Judge James W. Lessis rejected Dr. Miller's opinions and
concluded that Young could perform sedentary jobs (with certain limitations) that are
available in the national economy, such as optical lens inserter and stone setter. ALJ Lessis'

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

nondisability decision became the final decision of the Social Security Administration rejecting Young's SSI application, which Young now challenges.

Young seeks an Order reversing ALJ Lessis' decision and awarding her benefits. She alternatively seeks an Order vacating the ALJ's decision and remanding for further administrative proceedings. The Commissioner asks the Court to affirm the ALJ's decision.

The case is before the Court upon Young's Statement of Errors (Doc. #13), the Commissioner's Memorandum in Opposition (Doc. #17), Plaintiff's reply (Doc. #19), the administrative record, and the record as a whole. The Court has jurisdiction in this case. *See* 42 U.S.C. §405(g).

## II.   <u>**"Disability" Defined And ALJ Lessis' Nondisability Decision**</u>

Congress created the SSI program with the intent to assist "'those who cannot work because of age, blindness, or disability'... by 'set[ting] a Federal guaranteed minimum income level for aged, blind, and disabled persons.'"  *Schweiker v. Wilson* , 450 U.S. 221, 223, 101 S.Ct. 1074, 1077 (1981) (internal citations omitted; brackets in original); *see Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see also* 42 U.S.C. §1381a.

Because Young sought SSI based on her asserted disability, she had the burden to satisfy the SSI program's circumscribed definition of a "disability" under which:

> an individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering his [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ....

42 U.S.C. §1382c(a)(3)(B); *see Bowen*, 476 U.S. at 469-70.

2

When Young's SSI application and supporting evidence reached ALJ Lessis, he evaluated whether Young was under a disability under the 5-step sequential evaluation mandated by Social Security Regulations. *See* Tr. 18-28; *see also* 20 C.F.R. §416.920(a)(4).

Young's present challenges to ALJ Lessis' sequential evaluation arise, in part, at step 4 where assessed he assessed Young's residual functional capacity. This assessment established, in the ALJ's view, the most that Young can do despite her physical and mental impairments, and "any related symptoms, such as pain ...." 20 C.F.R. §416.945(a); *see Howard v. Comm'r of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002). ALJ Lessis concluded that Plaintiff can perform sedentary work[2] with the following exceptions:

> [S]he cannot perform more that negligible climbing, balancing, stooping, kneeling, crawling or crouching (with negligible being more than absolute zero but less than one-sixth of the day [one-sixth being midway between zero and "occasional"]).... She has negligible ability to operate foot controls. She is limited to negligible exposure to weather, cold, hot, wet/humid, vibration, moving mechanical parts, electric shocks, radiation, explosives and also fumes, orders [sic], gases and poor ventilation. The claimant is restricted to minimal (i.e., no more than incidental) contact with the public, coworkers and supervisors.

(Tr. 22) (brackets within the first parenthetical were used by the ALJ). ALJ Lessis also believed that Plaintiff could frequently reach, handle, finger, and feel. *Id*. And he concluded (in part) that Young, from a mental standpoint, "retains the reasoning, mathematics and language skills to perform simple work with understanding and carryout [sic] simple one-or-

---

[2] Under the Regulations, those able to perform sedentary work are in the lowest category of physical work ability. *See* 20 C.F.R. §416.967(a)-(e). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools...." §404.1567(a).

3

two-step instructions, dealing with standardized situation with occasional or no variables in situations encountered on the job...." (Tr. 22).

Young asserts that (1) the ALJ violated the treating physician rule by failing to provide good reasons for rejecting the opinions of her treating physician Dr. Miller; and (2) the ALJ improperly found her credibility lacking. Young also challenges the ALJ's reliance at step 5 of his sequential evaluation on the opinions of a vocational expert.

### III. Evidence

#### A. Young's Background and Testimony

Young was 38 years old when she filed her SSI application and is thus considered to be a younger person under Social Security Regulations. *See* 20 C.F.R. § 416.963(c). She has a limited education. And she asserts that her disability began on July 1, 2006.

Young testified during the ALJ's hearing that she was 5 feet 2½ inches tall and weighed 218 pounds. (Tr. 382). In addition to factory work, most of her past work has been "part time like for MacDonald's and WalMart." *Id.*; *see* Tr. 84. In 1999, she worked a daycare job for Shelby County, Ohio, achieving her best – yet still very modest – yearly earnings. (Tr. 382).

When asked to describe her medical problems, Young testified that she has lower back problems that extend down into her legs. She explained, "I get a burning sensation, and then it feels like they go numb, and then I have – the best way that I can describe it, it's like bee stings in my legs and – and I have arthritis in my neck, which has caused my bad headaches that I've had for a while now." (Tr. 382). She "can walk some with assistance."

4

(Tr. 386).

Young's feet swell to such an extent that she cannot wear shoes. She has pain or numbness in her thighs but not in her feet. Her fingers also swell, making them difficult to bend. She cannot bend, crawl, or kneel. She understands verbal instructions, and she does not have problems getting along with others, including supervisors. But she also testified, "I can't handle stress. I tell my husband all the time I'm gonna pack myself and leave, because I just can't take it because I've had too much happen." (Tr.385-86).

Young's prescription medications cause her to get very drowsy. She takes "Requip and Abilify at nighttime for the restless leg syndrome." (Tr. 384). She takes morphine twice a day; extra-strength Vicodin three times a day; and Neurontin, for nerve damage, three times a day. She has difficulty sleeping due to pain in her lower back. She sleeps only three or four hours each night; she takes naps twice a day. She also has problems concentrating and staying awake during the day. Young has difficulty reading and can only sometimes gets through a newspaper; she looks at the photos but the words are difficult.  (Tr. 387-88).

### B.    Treating Physician Dr. Miller

In May 2009, Dr. Miller completed a Functional Capacity Questionnaire (Physical), noting that he first saw Young for treatment in 1998. His listed Young's diagnoses as "fibromyalgia, back pain, possible herniated disc." (Tr. 224). He opined that Young could stand/walk up to 2 hours and sit up to 2 hours during an 8-hour day.  He noted that she was "in [a] wheelchair." *Id*. Dr. Miller believed that Plaintiff could not lift and carry much weight, even less than 10 pounds, in a competitive work situation. She could never stoop

5

(bend) or crouch, and she could rarely engage in fingering, grasping, or handling.

In June 2009, Dr. Miller completed a questionnaire. He listed the following diagnoses: fibromyalgia, chronic back pain, restless leg syndrome, chronic anxiety, chronic depression, "? conversion disorder," hypothyrodism, and gastric esophageal reflux syndrome. (Tr. 159)(question mark in original). Dr. Miller noted that Young had generalized muscular pain, especially in her upper legs. She needed, at times, to use a wheelchair or quadcane. And spasm accompanied her chronic back pain. *Id*. Dr. Miller wrote "fairly unremarkable" when asked to describe his pertinent clinical findings. *Id*. Dr. Miller described Young's work abilities to be limited by her inability to ambulate without assistance. He lastly opined that Young would be unable to cope with workplace stress, deadlines, instructions, and criticism. (Tr. 160).

As to Young's level of pain, the questionnaire asked, "How often during a typical workday is your patient's experience of pain severe enough to interfere with her attention and concentration needed to perform even simple work tasks?" Dr. Miller answered "frequently." (Tr. 224). Dr. Miller anticipated that Young's impairments or treatment would cause her to be absent from work "much more" than four days per month. *Id*. Dr. Young checked boxes identifying Young's symptoms as "impaired sleep, prescribed cane or other walking device, substance dependence, muscle weakness, [and] reduced range of motion." *Id*. (punctuation added).

On a "Mental Capacities Evaluation" form, Dr. Miller listed 13 prescribed

medications including, for example, Nexium, Celexa, Mirapex,[3] Vicodin, Synthroid, Lasix, and Xanax. (Tr. 225). Dr. Miller identified Young's symptoms as generalized persistent anxiety and difficulty thinking or concentrating. He checked a box indicating that Young's psychiatric condition would exacerbate her experience of "pain or any other physical symptom[.]" *Id*. When asked to explain, Dr. Miller noted, "mood lability contributes to muscle weakness and pain." *Id*. He opined again that Young would miss "much more" than 4 days per month. And, according to Dr. Miller, Young had "marked" limitations in her activities of daily living and in maintaining social relationships; "moderate" limitations in her ability to maintain concentration, persistence, or pace; and no episodes (or only mild episodes) of decompensation within the previous 12 months.

In December 2009, Dr. Miller diagnosed Young with fibromyalgia, neuralgia, hypothyroidism, depression, and anxiety. Her prognosis was guarded. Her symptoms included generalized muscular pain, muscle weakness, muscle spasm, and fatigue. On a scale of zero (no pain) to 10 (severe pain), Dr. Miller estimated Young's pain level at 7.

As he had in May 2009, Dr. Miller opined in December 2009 that Young could stand/walk up to 2 hours and sit up to 2 hours during an 8-hour day. He noted that Young was "in wheelchair for most activities" and was "sometimes able to use a quad cane." (Tr. 221). Dr. Miller further indicated that Young must use a cane or other assistive device while

---

[3] The National Institutes of Health website states that one use of Mirapex® (Pramipexole) is "to treat restless legs syndrome (RLS; a condition that causes discomfort in the legs and a strong urge to move the legs, especially at night and when sitting or lying down)." http://www.nlm.hin.gov (medlineplus, drugs & supplements database).

she was engaging in occasional standing/walking. On October 26, 2008, Dr. Miller prescribed a "walker" for Young, noting "leg pain." (Tr. 281). Dr. Miller further indicated in December 2009 that during an average 8-hour workday, Young could never lift and carry much weight, even less than 10 pounds. She also was significantly limited in her ability to do repetitive reaching, handling, fingering, or lifting. *Id*.

Dr. Miller indicated that the following would affect Young's ability to work at a regular job on a sustained basis: psychological limitations; no stooping, pushing, kneeling, pulling, or bending; and she needed to avoid heights. (Tr. 222) Dr. Miller indicated that Young was not a malingerer, and he opined that she was incapable of tolerating even a low amount of stress. He noted that his conclusion was based on "history and interview." *Id*.

In March 2010, Dr. Miller completed a basic medical form opining that Young's condition was deteriorating. (Tr. 251). He noted that Young exhibited tenderness and decreased range of motion in her neck and back. *Id*. He concluded that during an 8-hour workday, Young could stand/walk for 0 hours, sit 4 hours, and perform no lifting or carrying. (Tr. 252). Dr. Miller also believed that Young was extremely limited in her ability to push/pull, bend, and reach. And Dr. Miller checked a box indicating his opinion that Young was unemployable. *Id*.

### C.     **Drs. Danopulos and Graham**

In February 2009, Dr. Danopulos examined Young for the Ohio Bureau of Disability Determinations. (Tr. 175-80). He summarized his examination and opinions as follows:

Ms. Yvette Young is a thirty-nine-year-old female with complaints of

8

fibromyalgia with restless leg syndrome, neck pain, hypertension, hypothyroidism, needing diuretics for ankle swelling, and depression with anxiety.

She gave a history of fibromyalgia which was diagnosed a year ago by her family physician. For three months she used a walker and for the last one month she uses a wheelchair.... On clinical examination, both upper extremities were painless, with normal motions, but lower extremities, including hips and knees she was resisting forcefully any motions, so it could not be done. The clinical impression was arthralgias, if any. Her behavior was accepted as being conversion disorder....

Cervical spine and the entire spine were painful by pressure. Cervical spine motions were normal and painless. The cervical spine X-rays were unremarkable.

* * *

She gave a history of depression which she suffers for the last three years. The first year she had been treated by a psychiatrist but then she discontinued seeing him and taking his prescription medication. She has already been evaluated by a Social Security psychologist two or three months ago.

The objective findings were: 1) history of fibromyalgia, with non-specific, if any pain in her joints and resisting the motions of both hips and knees which could not be examined, without any neurologic pathology and suggested conversion, 2) cervical spine arthralgias, 3) well controlled blood pressure, and 4) history of anxiety with depression.

Her ability to do any work-related activities is affected and restricted from her conversion disease, plus her depression and anxiety which has already been evaluated properly by a Social Security psychologist.

(Tr. 179-80).

In October 2009, Dr. Graham examined the record for the Ohio Bureau of Disability Determinations. He opined that Young could perform light work with occasional balancing, stooping and climbing of stairs/ramps; frequent kneeling and crawling; and never climbing

ladders/ropes/scaffolds. (Tr. 140-47).

###    D.    Psychologists Chaffins and Chambly

In November 2008, psychologist Belinda J. Chaffins, Psy.D., examined Young for the Ohio Bureau of Disability Determinations. (Tr. 207-23). Young was 39 years old at that time.

Dr. Chaffins' diagnostic impression included no Axis I (clinical-disorder) diagnosis and one Axis II diagnosis – borderline intellectual functioning. (Tr. 212). Dr. Chaffins assessed Young's then-current GAF[4] at 60, referring to moderate symptoms or moderate difficulty in  occupational functioning.

As to Young's abilities in four work-related mental abilities, Dr. Chaffins opined:

1.    Mrs. Young's ability to relate to others is not impaired as evidenced by no significant symptoms reported by her....

2.    Her ability to understand and follow instructions is not impaired as evidenced by no problems with immediate memory or concentration....

3.    Her ability to maintain attention to perform simple repetitive tasks is mildly impaired as evidenced by her difficulty completing some of the sensorium tasks: Serial 7's, remembering names of past presidents and in the digits backward task.

4.    Her ability to withstand the stress and pressures associated with day-to-day work activities is likely to not be impaired due to lack of significant symptoms of anxiety or depression reported by client nor observed during the assessment. Her symptoms didn't increase as the assessment progressed; however, she

---

[4]  Health care clinicians perform a GAF, Global Assessment of Functioning, to determine a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Hash v. Commissioner of Social Sec.*, 309 Fed.Appx. 981, 988 n.1 (6th Cir. 2009); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34.

appeared a little tired at the end. She appeared to be working very hard and put forth her best effort during the assessment process. She seems to have good insight and judgment.

(Tr. 213).

In December 2008, psychologist Alice Chambly, Psy.D, evaluated the record for the Ohio Bureau of Disability Determinations. She concluded as to each area of mental-work ability, Young was less than "markedly impaired" or there was no evidence of a limitation. (Tr. 202-03). Dr. Chambly opined, in part, that Young "has good insight and judgement. She is able to perform daily activities independently. She has no limitations in her social functioning or concentration. She would have some moderate limitations in her ability to understand more detailed tasks. However, she would be able to perform 1-2 step tasks without difficulties. Claimant's statements are credible. Consultative examiner's [Dr. Chaffins'] assessment of claimant's functioning is the only psychological evidence in file. It is consistent with the MER [medical evidence of record (presumably)] and given considerable weight." (Tr. 204).

## IV.  **Judicial Review**

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

The substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains

11

evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Social Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing the ALJ's legal criteria for correctness – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Sec*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r of Social Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

**V.    Discussion**

Young contends that the ALJ violated the treating physician rule by failing to provide good reasons – as the Regulations require – for rejecting Dr. Miller's opinions.

The Commissioner contends that the ALJ reasonably explained why he gave little weight to Dr. Miller's opinions. The Commissioner reasons, "The ALJ explained that he

12

gave little weight to the assessment of Dr. Miller, as his opinions were brief and conclusory, and were unsupported by medical signs and objective examination findings from his treatment notes, as well as the normal clinical examinations and objective testing throughout the record." (Doc. #17, PageID at 70).

The ALJ found that "good cause" existed to reject Dr. Miller's opinions. (Tr. 25). The ALJ's use of this phrase "good cause" finds no identical supporting language in the Regulations that apply to the ALJ's evaluation of treating medical source opinions. *See* 20 C.F.R. §416.927(d)(2)-(5). Rather than looking for "good cause" to reject a treating physician's opinions, the Regulations provide much more specific mandatory instructions to ALJs, beginning with the treating physician rule: "The ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and 'is not inconsistent with the other substantial evidence in the case record.'" *Blakley*, 581 F.3d at 406; *see Wilson*, 378 F.3d at 544; 20 C.F.R. §416.927(d)(2). The Regulations further mandate that where controlling weight does not apply, the ALJ must continuing weighing the treating physician's opinions by applying certain factors: "namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source ...." *Wilson*, 378 F.3d at 544; *see* 20 C.F.R. §416.927(d)(2)-(6).

The phrase "good cause" applied by the ALJ finds no identical supporting language

13

in the applicable Regulation, 20 C.R.F. §416.927(d), and the phrase is too nebulous to incorporate the Regulation's specific requirement that "controlling weight" must be given to a treating physician's opinion when the treating physician rule is met. *See id*; *see also Wilson*, 710 F.3d at 376 ("An ALJ must give the opinion of a treating source controlling weight..." if the requirements of the treating physician rule apply). The ALJ's brief discussion of the standards applicable to treating physicians and other medical sources overlooks, or at a minimum downplays, the deference generally applicable to treating source opinions. The ALJ wrote, for example, "Social Security Ruling 96-2p states that generally a treating physician's opinion is given great weight. However, such opinion must be supported by medically acceptable clinical or diagnostic techniques, and any other evince [sic] of record...." (Tr. 25). Although this is an apparent attempt to set forth the treating physician rule, the ALJ did not set forth the correct legal criteria. The treating physician rule, where applicable, requires the ALJ to place "controlling weight" – not merely "great weight"– on the treating physician's opinion. The phrase "controlling weight" is the precise language used in the Regulation, §416.927(d)(2), and is repeated time and again in Social Security Ruling 96-2p and caselaw, *e.g., Rogers*, 486 F.3d at 243; *Wilson*, 378 F.3d at 544.

In addition, when a treating physician's opinion is given "controlling weight," the opinion controls over what? It controls over other medical source opinions of record, especially those provided by non-treating and non-examining medical sources. In contrast, if the ALJ's "great weight" is applied to a treating physician's opinion, such weight could be overborne by a non-examining or record-reviewing medical source opinion without any

14

consideration of the deference generally due a treating medical source's opinions. This is

contrary to 20 C.F.R. §416.927, which dictates a process by which ALJs must consider the

source of the opinion – *i.e*., whether it is from a treating source or an examining source or a

record-reviewing source. *See Gayheart v. Comm'r of Social Sec*., 710 F.3d 365, 376 (6th

Cir. 2013) ("The source of the opinion ... dictates the process by which the Commissioner

accords it weight."). "In other words, '[t]he regulations provide progressively more rigorous

tests for weighing the opinions as the ties between the source of the opinion and the

individual become weaker.'" *Id*. at 375 (quoting, in part, Soc. Sec. Ruling 96-6p, 1996 WL

374180 at *2). "Even if the treating physician's opinion is not given controlling weight,

'there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician

is entitled to great deference.'" *Hensley v. Comm'r of Social Sec.*, 573 F.3d 263, 266 (6th

Cir. 2009) (quoting, in part, *Rogers*, 486 F.3d at 242). By substituting a good cause/great

weight review in place of the regulatory-required review for "controlling weight," the ALJ

failed to subject Dr. Miller's opinions to the mandatory Regulatory requirements of the

treating physician rule. *See Blakley*, 581 F.3d at 406; *see also Hensley v. Comm'r of Social

Sec.*, 573 F.3d 263, 266 (6th Cir. 2009).

 The ALJ also made a passing reference to the Regulation and Rulings applicable to

evaluating medical source opinions.  He wrote, "The undersigned has also considered the

opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p,

96-5p and 06-3p." (Tr. 24).  Without some more meaningful application and explanation of

the applicable legal standards required by this Regulation and these Rulings, this passing

reference does not satisfy the ALJ's mandatory duty to provide "good reasons" for rejecting Dr. Miller's opinions. *Rogers*, 486 F.3d at 246.

Another problem with the ALJ's recitation of the standards applicable to Dr. Miller's opinions exists in the ALJ's concern that the treating physician's opinion must be supported by "any other evi[de]nce of record." This language does not track the Regulation's controlling-weight requirement that a treating physician's opinion must not be "inconsistent with other <u>substantial</u> evidence ... [of] record ...." §416.927(d)(2) (emphasis added). Rather than such "substantial evidence," use of the ALJ's phrase "any other evi[de]nce of record" may allow an ALJ to decline to apply the treating physician rule on the ground that the physician's opinion was contrary to any single piece of evidence in the record. At best for the ALJ, the phrase "any other evi[de]nce of record" is ambiguous, allowing any particular evidence to either defeat the treating physician rule or suffice to support the treating physician rule. Such ambiguity would not exist if the ALJ had stuck more strictly to the language of the Regulation by determining whether Dr. Miller's opinion was "not inconsistent with the other substantial evidence ... [of] record ...." 20 C.F.R. §416.927(d)(2).

Even if the ALJ applied the correct legal criteria to Dr. Miller's opinion, he erred by rejecting it based on "the findings from other treating or examining physicians, the findings and opinions of the consultative physician and psychologist, and the findings of the non examining State agency medical experts." (Tr. 25). Although an ALJ may – in some situations – reject a treating medical source's opinions based on contrary opinions of a consultative source, a one-time examiner, or a record-reviewing source, the ALJ must weigh

such contrary opinions under the factors mandated by the Regulations. Social Security

Ruling 96-6p explains, "the opinions of physicians or psychologists who do not have a

treatment relationship with the individual are weighed by stricter standards, based to a

greater degree on medical qualifications, and explanations for the opinions, than are required

of treating sources." 1996 WL 374180 at *2. There is no indication in the ALJ's decision

that he evaluated the opinions of Drs. Danopulos, Graham, Chaffins, or Chambly

under the factors required by the Regulations, §416.929(d)(3)-(6) or Ruling. 96-6p. This

constituted error because "[a] more rigorous scrutiny of the treating-source opinion than the

nontreating and nonexamining opinions is precisely the inverse of the analysis that the

regulation requires." *Gayheart*, 710 F.3d at 379-80.

Young also contends, relying on *Rogers v. Comm'r of Social Sec*., 486 F.3d 234 (6th

Cir. 2007), that the ALJ's use of a lack of objective evidence did not constitute a "good

reason" for rejecting Dr. Miller's opinions, especially with regard to the pain associated with

Young's fibromyalgia. This contention is well taken at least to the extent that the ALJ

demanded objective medical evidence in support of Dr. Miller's opinion concerning the

severity of Young's fibromyalgia. "[F]ibromyalgia can be a severe impairment and that,

unlike medical conditions that can be confirmed by the existence of objective testing,

fibromyalgia patients present no objectively alarming signs....  Rather, fibromyalgia patients

'manifest normal muscle strength and neurological reactions and have a full range of

motion." *Rogers*, 486 F.3d at 243-44 (internal citations omitted).  It was therefore error for

the ALJ to require objective medical evidence in support of Dr. Burks' opinion regarding the

17

severity of Plaintiff's fibromyalgia.  *See id*; *see also Kalmbach v. Comm'r of Soc. Sec.*, unpublished op., 2011 WL 63602 at *9 ("Thus, the ALJ's contention that the treating physicians' assessments and opinions were unsupported by other objective medical evidence was simply beside the point."). Although Dr. Miller's treatment records do not indicate any specific number of trigger points that Young exhibited upon testing, Dr. Miller repeatedly documented the pain she experienced without indicating that he doubted the sincerity of her reports. Additionally, Dr. Danopulos, examining physician for the Ohio Bureau of Disability Determinations, identified in his objective findings that Young has a "history of fibromyalgia, with non-specific, if any pain in her joints and resisting motions of both hips and knees, without any neurologic pathology and suggested conversion ...." (Tr. 179). Because this objective finding was comparable to, if not consistent with, Dr. Miller's diagnosis of fibromyalgia and his treatment of Young with prescription pain medications, the ALJ erred by discounting Dr. Miller's opinions for lack of objective evidence of fibromyalgia. *See Rogers*, 486 F.3d at 243-46.

Accordingly, for the above reasons, Young's Statement of Errors is well taken.[5]

## VI.  <u>Remand is Warranted</u>

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of  42 U.S.C.

---

[5] Because a remand is warranted in this case, an in-depth analysis of the parties' contentions concerning the ALJ's evaluation of Plaintiff's credibility and the ALJ''s reliance of the vocational expert's testimony is unwarranted.

§405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of a disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176.

Young, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) due to problems set forth above. On remand the ALJ should be directed to (1) evaluate all the medical source opinions of record under the legal criteria applicable under the Commissioner's Regulations and Rulings and as mandated by case law; and (2) review Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and thus eligible for SSI.

### IT IS THEREFORE RECOMMENDED THAT:

1.   The Commissioner's non-disability finding be vacated;

2.   No finding be made as to whether Plaintiff Yvette Young was under a "disability" within the meaning of the Social Security Act;

3.   This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration

consistent with this Report; and

4. The case be terminated on the docket of this Court.


July 3, 2013

       s/Sharon L. Ovington       
Sharon L. Ovington
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).
140 (1985).